IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| LAURA FRANKE,<br><br>　　　Plaintiff,<br><br><br><br>　　　　　　vs.<br><br><br><br>MICHAEL J. ASTRUE, Commissioner of Social Security,<br><br>　　　　Defendant. | MEMORANDUM DECISION AND ORDER ON ADMINISTRATIVE APPEAL<br><br><br><br><br><br>Case No. 1:11-CV-51 TS |

This matter comes before the Court on Plaintiff Laura Franke's appeal from the decision of the Social Security Administration denying her application for disability insurance benefits. Having considered the arguments set forth by the parties, reviewed the factual record, relevant case law, and being otherwise fully informed, the Court will affirm the administrative ruling, as discussed below.

# I.  STANDARD OF REVIEW

This Court's review of the ALJ's decision is limited to determining whether its findings are supported by substantial evidence and whether the correct legal standards were applied.[1] Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[2]  The ALJ is required to consider all of the evidence, although he or she is not required to discuss all of the evidence.[3]  If supported by substantial evidence, the Commissioner's findings are conclusive and must be affirmed.[4]

The Court should evaluate the record as a whole, including that evidence before the ALJ that detracts from the weight of the ALJ's decision.[5]  However, the reviewing court should not re-weigh the evidence or substitute its judgment for that of the ALJ's.[6]

---

[1] *Rutledge v. Apfel*, 230 F.3d 1172, 1174 (10th Cir. 2000).

[2] *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996).

[3] *Id*.

[4] *Richardson v. Perales*, 402 U.S. 389, 402 (1981).

[5] *Shepard v. Apfel*, 184 F.3d 1196, 1199 (10th Cir. 1999).

[6] *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).

## II.  BACKGROUND

### A.    PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits on December 20, 2007.[7]

Plaintiff's claim was initially denied on March 7, 2008,[8] and upon reconsideration on June 27,

2008.[9]  Plaintiff then requested a hearing before an administrative law judge ("ALJ"), which was

held on October 6, 2009.[10]  The ALJ issued a decision on December 18, 2009, finding Plaintiff

was not disabled.[11]  The Appeals Council denied Plaintiff's request for review on February 11,

2011.[12]  Plaintiff then filed the instant action.

### B.    MEDICAL HISTORY

Plaintiff began counseling with Dr. Wing in April 2007 for her mental health problems

and drug dependence.[13]  Dr. Wing's notes reflect that Plaintiff's bipolar disorder was under

control, and that she was alert, behaved appropriately, and was able to focus.[14]  Although

_____

[7]R. 119-21.  Plaintiff's brief mistakenly states that she applied for both disability
insurance benefits and social security income. The record reflects that Plaintiff did not apply for
social security income. Therefore, the ALJ only evaluated her disability insurance benefits claim.

[8]*Id*. at 16.

[9]*Id*. at 83.

[10]*Id*. at 91, 31-73.

[11]*Id*. at 16-28.

[12]*Id*. at 2-5.

[13]*Id*. at 294-98, 307-55.

[14]*Id*. at 307-55.

Plaintiff was commonly "tearful and craving" drugs, Dr. Wing noted that she was able to hold a responsible position at work and was told by Plaintiff that she was "restarting work on Oct 1 2007."[15]

In addition to counseling with Dr. Wing, Plaintiff began treatment for drug dependency with Dr. Rodgers in May 2007.[16]  Dr. Rodgers diagnosed her with bipolar disorder, hypertension fibromyalgia, and opioid type dependence.  She was prescribed Suboxone for her opioid type dependence.  Plaintiff stopped taking her anti-seizure medication and ultimately suffered a seizure in July 2007.[17]  Dr. Wing suspected that the seizure was likely caused by Lamictal withdrawal.  Since that time, Plaintiff's seizure disorder has remained stable with medications.

In January 2008, Plaintiff completed an Agency "Function Report", wherein Plaintiff represented that her daily activities consisted of: taking her children to school, running errands, some house cleaning, and laundry.[18]  Plaintiff noted that she enjoyed going out once or twice a day on most days, and that otherwise she watched TV, spent time with her boyfriend, and read.[19] Plaintiff further noted that she could no longer do yard work without help, could not cook like she used to, feared driving, and had several memory problems.[20]

---

[15]*Id*. at 307.

[16]*Id*. at 247.

[17]*Id*. at 257, 322-23.

[18]*Id*. at 155-57.

[19]*Id*. at 158-59.

[20]*Id*. at 157-160.

In February 2008, Plaintiff's boyfriend passed away and she relapsed into drug use.[21]  On March 14, 2008, Plaintiff voluntarily checked in for a five-day detoxification program at Highland Ridge hospital.[22]  Further, Dr. Wing discharged Plaintiff because she had stopped coming in for treatment and "was no longer interested in" his services.[23]

In March 2008, Patricia Truhn, a state agency psychological consultant, reported that Plaintiff had mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and one or two episodes of decompensation.[24]  Ms. Truhn concluded that Plaintiff is "capable of simple work with limited public contract."[25]

Ms. Truhn also completed a mental residual functional capacity assessment in relation to Plaintiff.[26]  In that assessment, Ms. Truhn opined that Plaintiff was not significantly limited in her ability to: remember locations and work-like procedures; understand very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with proximity to others without being distracted by them; make simple work-

---

[21]*Id*. at 398.

[22]*Id*.

[23]*Id*. at 385-86.

[24]*Id*. at 369.

[25]*Id*. at 371.

[26]*Id*. 381-83.

related decisions; ask simple questions or request assistance; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and to adhere to basic standards of cleanliness; be aware of normal hazards and take appropriate precautions; travel to unfamiliar places or use public transportation; and set realistic goals or make plans independently of others.[27]

Ms. Truhn opined that Plaintiff was moderately impaired in her ability to: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting.[28]  Ms. Truhn found no marked limitations in any category.

In addition, David O. Peterson, M.D., a state agency physician, assessed Plaintiff's physical residual functional capacity.[29]  He concluded that Plaintiff's headaches, seizures, and fibromyalgia necessitated light exertional activities.[30]

---

[27]*Id*. at 381-82.

[28]*Id*.

[29]*Id*. at 373-80.

[30]*Id*. at 380.

On July 1, 2008, Dr. Rodgers completed a Residual Functional Capacity Questionnaire regarding Plaintiff.[31]  In that assessment, Dr. Rodgers found Plaintiff could stand and/or walk for about one hour in an 8-hour workday; sit for 5 hours in an 8-hour workday; need to take a 10 minute break every hour during the workday; only walk one city block without rest or significant pain; occasionally lift 10 pounds but never more than 20 pounds; would miss work at least four times per month; spend 10% of an 8-hour workday grasping, turning, or twisting objects with her hands; spend 50% of her workday reaching with her arms; and spend 50% of her workday using her fingers for fine manipulation of objects.[32]

Between July 2008 and August 2009, Plaintiff continued to see Dr. Rodgers for her psychiatric medications and drug dependency.[33]  Dr. Rodgers' notes reflect that Plaintiff was "doing well" due to her medication and out-patient therapy.[34]  Further, Dr. Rodgers continually found Plaintiff was in no distress and was alert and oriented.  Plaintiff reported her fibromyalgia as "stable" during a number of visits to Dr. Rodgers.  He noted tenderness in her lower back.

Between October 2008 and January 2009, Plaintiff saw Mr. Eric McCarty, a licensed therapist.  He opined that Plaintiff was "doing well."[35]  Further, he noted that she was attending an addiction program and was following her relapse prevention program.  In February 2009, Mr.

---

[31]*Id*. at 393-94.

[32]*Id*.

[33]*Id*. at 420-75.

[34]*Id*. at 443.

[35]*Id*. at 412-417.

McCarty completed an evaluation regarding Plaintiff's progress, qualifying her to "enter aftercare."[36]

On May 20, 2009, Dr. Rodgers completed another Residual Functional Capacity Questionnaire regarding Plaintiff.[37]  Dr. Rodgers concluded that Plaintiff could occasionally lift 20 pounds; stand and/or walk for about 1 hour in an 8-hour workday; sit for about 4 hours in an 8-hour workday; need at least one 10-minute break each hour; and would miss work at least four times per month.[38]  Further, Dr. Rodgers opined that Plaintiff could spend 10% of an 8-hour workday grasping, turning, or twisting objects with her hands; 10% of her workday reaching with her arms; and 30% of her workday using her fingers for fine manipulation of objects.[39]

In June 2009, Mr. McCarty completed two Listing Questionnaire forms on behalf of Plaintiff.[40]  He concluded that Plaintiff had a "complete inability to function independently outside the area of [her] home—without the structure of treatment."[41]

C.      HEARING TESTIMONY

At the hearing, the ALJ heard testimony from Plaintiff and a vocational expert.  Plaintiff testified that in July 2007 her work as a senior case manager became too stressful, at which time

---

[36]*Id.* at 412-13.

[37]*Id.* at 458-59.

[38]*Id.*

[39]*Id.* at 459.

[40]*Id.* at 463-66.

[41]*Id.* at 466.

she went on short-term and then long term disability.[42]  She testified that she tried to return to her job in October 2007, but was unable to meet the demands of her work because of her inability to concentrate, mind racing, irritability, and crying spells.[43]  Plaintiff testified that she was terminated in April 2009 when her long-term disability ended.[44]

Plaintiff testified that she suffers periods of mania and anxiety with the following symptoms: inability to concentrate; poor memory; inability to sleep; nightmares; irritability; impulsivity; panic attacks; and migraine headaches.[45]  At times when she is experiencing a manic episode, Plaintiff stated that she "just shut[s] down to deal with the stress" and "it's easier for [her] just to sleep" because she does not know how to cope with it.[46]  Further, Plaintiff testified that during such periods she has problems attending to her personal hygiene.[47]  Plaintiff testified that, as a result of her fibromyalgia, she has chronic pains in all her joints and it limits her ability to be active.[48]

---

[42]*Id*. at 37-38.

[43]*Id*. at 39-44.

[44]*Id*. at 39.

[45]*Id*. 49-52.

[46]*Id*. at 54.

[47]*Id*. at 54-55.

[48]*Id*. at 56.

Plaintiff testified that her activities of daily living include: getting her sons up to go to school, going back into bed until they return home, and then preparing dinner.[49]  She also stated that she does the dishes, shops with a friend, and runs errands.[50]  When asked about her history of polysubstance abuse, Plaintiff testified that she returned to using heroine for about six weeks after her boyfriend died in 2008, but has since completed a rehabilitation program and has remained clean.[51]  Plaintiff testified that she could not perform a job as a mailroom sorter because she gets frustrated easily, feels overwhelmed, and would be afraid of making mistakes.[52]

The vocational expert testified that Plaintiff's past relevant work was as a customer complaint worker.  The ALJ presented the vocational expert with a hypothetical of a person of Plaintiff's age, education, and work experience, along with certain limitations.  The vocational expert testified that Plaintiff could perform a number of unskilled sedentary jobs.[53]  The vocational expert was asked whether any of her testimony conflicted with the information contained in the Dictionary of Occupational Titles.  She responded by stating that the Dictionary of Occupational Titles does not discuss a sit/stand option.  However, the vocation expert testified that "based on [her] experience placing individuals in these types of jobs and conducting labor

---

[49]*Id*. at 59.

[50]*Id*. at 59-60.

[51]*Id*. at 48.

[52]*Id*. at 62-63.

[53]*Id*. at 68-70.

market surveys and job analyses" that such jobs do allow for a sit/stand option in reduced numbers.[54]

D.      THE ALJ'S DECISION

The ALJ followed the five-step sequential evaluation process in deciding Plaintiff's claims.  At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since July 2, 2007.[55]  At step two, the ALJ found that Plaintiff suffered from the following severe impairments: bipolar disorder, anxiety disorder, a seizure disorder, and a history of polysubstance abuse.[56]  The ALJ did not find Plaintiff's alleged fibromyalgia to be a severe impairment because it did "not present significant limitations."[57]  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment.[58]  At step four, the ALJ found that Plaintiff was unable to perform any of her past relevant work.[59]  At step five, the ALJ found that there were jobs that exist in significant

---

[54]*Id*. at 70-71.

[55]*Id*. at 18.

[56]*Id*.

[57]*Id*. at 19.

[58]*Id*. at 19-20.

[59]*Id*. at 26.

numbers in the national economy that Plaintiff could perform.[60]  Therefore, the ALJ found that

Plaintiff was not disabled.[61]

### III.  DISCUSSION

Plaintiff raises four arguments in her brief: (1) the ALJ erred in failing to properly

evaluate the opinions of Plaintiff's treating physician; (2) the ALJ erred by failing to fully

develop the record; (3) the ALJ erred by failing to articulate a residual functional capacity

("RFC") that included all of Plaintiff's limitations; and (4) the ALJ erred by failing to undertake

a separate drug and alcohol analysis.[62]  The Court will address each argument in turn.

A.    WHETHER THE ALJ ERRED IN FAILING TO PROPERLY EVALUATE THE
      OPINIONS OF PLAINTIFF'S TREATING PHYSICIANS

Plaintiff first argues that the ALJ erred in failing to properly evaluate the opinions of her

treating physician. Specifically, Plaintiff argues that the ALJ erred in his treatment of the

opinions of Dr. Rodgers.[63]

The ALJ did not accept the opinions of Dr. Rodgers regarding the July 2008 and May

2009 physical residual functional capacity, "as controlling as they are not well supported by

_____

[60]*Id*. at 27-28.

[61]*Id*. at 29.

[62]In her Reply Brief, Plaintiff appears to abandon this final argument, but the Court will
still address it below.

[63]Plaintiff also takes issue with the ALJ's statements that Dr. Rodgers and Mr. McCarty
filled out their RFC questionnaires at the request of counsel and for the purpose of obtaining
benefits.  Plaintiff argues that "[t]his is an invalid basis for discrediting their assessments."
Docket No. 17, at 11.  This is a misreading of the ALJ's opinion.  There is nothing to suggest that
the ALJ discredited the statements of Dr. Rodgers and Mr. McCarty because they filled out the
questionnaires at the request of counsel or for the purpose of litigation.

medically acceptable clinical and diagnostic techniques, nor are they consistent with the doctor's own reports."[64]   However, the ALJ accepted Dr. Rodgers' "opinions with regards to medical issues relating to the nature and severity of [Plaintiff's] impairment."[65]   The ALJ noted that "the opinion as to [Plaintiff's] residual functional capacity, the ability to do past work, the ability to do other work and whether there is a disability under the Social Security Act are all issues reserved to the Commissioner."[66]   The ALJ therefore afforded "diminished weight" to Dr. Rodgers' opinion on those issues "as they indicate very extreme limitations that are unsupported by the objective evidence and inconsistent with the [Plaintiff's] activities of daily living as demonstrated in the record."[67]   Similarly, the ALJ gave "little weight" to his opinions regarding the Plaintiff's "ability, or lack thereof, to perform work-related activities."[68]

The ALJ, in reviewing the opinions of treating sources, must engage in a sequential analysis.[69]   First, the ALJ must consider whether the opinion is well-supported by medically acceptable clinical and laboratory techniques.[70]   If the ALJ finds that the opinion is well-supported, then he must confirm that the opinion is consistent with other substantial evidence in

---

[64]R. at 25.

[65]*Id.*

[66]*Id.*

[67]*Id.*

[68]*Id.*

[69]*Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003).

[70]*Id.*

the record.[71]  If these conditions are not met, the treating physician's opinion is not entitled to controlling weight.[72]

This does not end the analysis, however.  Even if a physician's opinion is not entitled to controlling weight, that opinion must still be evaluated using certain factors.[73]  Those factors include:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.[74]

After considering these factors, the ALJ must give good reasons for the weight he ultimately assigns the opinion.[75]  If the ALJ rejects the opinion completely, he must give specific, legitimate reasons for doing so.[76]

The Court finds that the ALJ properly analyzed the opinions of Dr. Rodgers.  First, the ALJ found that Dr. Rodgers' opinions were not well-supported by medically acceptable clinical and laboratory techniques.  The ALJ specifically noted the lack of treatment notes to support Dr.

---

[71]*Id.*

[72]*Id.*

[73]*Id.*

[74]*Id.* at 1301 (quoting *Drapeau v. Massanri*, 255 F.3d 1211, 1213 (10th Cir. 2001)).

[75]*Id.*

[76]*Id.*

Rodgers' position.  Although he diagnosed Plaintiff with fibromyalgia, the ALJ found Dr.

Rodgers' "treatment notes do not indicate any specific assessment for fibromyalgia."[77]

Second, the ALJ found that Dr. Rodgers' opinions were inconsistent with the other

evidence in the record.  Although the treatment notes and other examinations show a degree of

limitation, the ALJ found that Dr. Rodgers "never advised her to significantly reduce her

performance of activities of daily living during the course of treating her."[78]  The ALJ further

noted that Dr. Rodgers' opinions are inconsistent with his own reports, because he routinely

"found [Plaintiff] in no apparent distress and findings upon examination were within normal or,

at most, mild limits."[79]  Specifically, the ALJ pointed to Plaintiff's activities of daily living.

Plaintiff takes issue with the fact that the ALJ failed to cite any portion of the record that

indicates that Plaintiff's activities of daily living contradict Dr. Rodgers opinions.[80]  While the

Court agrees that the ALJ could have done a better job at citing portions of the record in his

decision, it is clear that the record contains substantial evidence supporting the ALJ's

conclusions.

---

[77]R. at 19.

[78]*Id*.

[79]*Id*.

[80]*See id*. at 155-57 (noting that her daily activities included running errands, cleaning the house, preparing meals, chauffeuring for her two sons, taking care of dog, and yard work with help from family and friends).

Further, Ms. Truhn found that, from a psychological perspective, Plaintiff appeared capable of simple work limited to public contact.[81]  Based on these things, the Court finds that there is substantial evidence to support the ALJ's conclusion that Dr. Rodgers' opinions were inconsistent with the record.

Plaintiff relies heavily on *Krauser v. Astrue*,[82] in support of his position that the ALJ's analysis of Dr. Rodgers was inadequate.  The Court finds *Krauser* to be distinguishable.  In *Krauser*, the ALJ simply concluded that the treating physician's opinion was not given controlling weight, "and then *said no more about it*."[83]  The ALJ's analysis here provides substantially more detail than that provided in *Krauser*.

Finally, the Court finds that the ALJ properly rejected those opinions of Dr. Rodgers which encroached on the Commissioner's duty.  Those types of opinions are reserved to the Commissioner.[84]

Based on the above, the Court finds that the ALJ applied the correct legal standard in evaluating Dr. Rodgers' opinions and there was substantial evidence to support the ALJ's decision concerning those opinions.

---

[81]*Id.* at 371.

[82]638 F.3d 1324 (10th Cir. 2011).

[83]*Id.*

[84]*See* 20 C.F.R. § 404.1527(e).

16

B.      WHETHER THE ALJ ERRED IN FAILING TO FULLY DEVELOP THE RECORD

The ALJ found that Plaintiff's fibromyalgia was a "medically determinable impairment that does not present significant limitations and is thus non-severe."  Plaintiff argues that the ALJ failed to fully and fairly develop the record with regard to Plaintiff's fibromyalgia.

"An ALJ has the duty to develop the record by obtaining pertinent, available medical records which come to his attention during the course of the hearing."[85]

> Nonetheless, in cases such as this one where the claimant was represented by counsel at the hearing before the ALJ, "the ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored,"' and the ALJ "may ordinarily require counsel to identify the issue or issues requiring further development."[86]

Further, "[a]lthough the ALJ has the duty to develop the record, such a duty does not permit a claimant, through counsel, to rest on the record—indeed, to exhort the ALJ that the case is ready for decision—and later fault the ALJ for not performing a more exhaustive investigation."[87]  "In short, we will not ordinarily reverse or remand for failure to develop the record when a claimant is represented by counsel who affirmatively submits to the ALJ that the record is complete.  This is particularly the case when the missing medical records are not obvious from the administrative record or otherwise brought to the attention of the ALJ."[88]

---

[85]*Carter v. Chater*, 73 F.3d 1019, 1022 (10th Cir. 1996).

[86]*Branum v. Barnhart*, 385 F.3d 1268, 1271 (10th Cir. 2004) (quoting *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997).

[87]*Maes v. Astrue*, 522 F.3d 1093, 1097 (10th Cir. 2008).

[88]*Id.*

In this case, Plaintiff's counsel at the hearing before the ALJ did not object to the exhibits admitted in the administrative record and affirmatively stated that the record could be closed.[89] Thus, the Court cannot find that the ALJ failed to adequately develop the record.  Therefore, remand is not required.

Further, there was substantial evidence in the record support the ALJ's finding that Plaintiff's fibromyalgia was not a severe impairment.  While it is true that the record contains references to Plaintiff's diagnosis, there is little evidence of treatment for that condition and equally little evidence suggesting that her fibromyalgia limited Plaintiff in her abilities. Therefore, the Court must reject Plaintiff's arguments that the ALJ was required to supplement the record.

C.    WHETHER THE ALJ ERRED IN FAILING TO ARTICULATE AN RFC THAT INCLUDED ALL OF PLAINTIFF'S LIMITATIONS

Plaintiff argues that the ALJ failed to: (1) properly develop and analyze the effects Plaintiff's fibromyalgia in his RFC assessment; (2) properly consider the opinions of both Dr. Rodgers and Mr. McCarty in his RFC assessment; and (3) comply with the requirements of Social Security Ruling 96-8p.[90]

Plaintiff argues that the ALJ's RFC assessment failed to adequately take into account her fibromyalgia.  Under the regulations, the ALJ is required to consider all of Plaintiff's

---

[89]R. at 33.

[90]Docket No. 17, at 17-20.

impairments, including those that are not severe.[91]  The law in this Circuit is equally clear: "It is beyond dispute that an ALJ is required to consider all of the claimant's medically determinable impairments, singly and in combination."[92]

In this case, the record reflects that the ALJ did consider Plaintiff's fibromyalgia in determining Plaintiff's RFC.  As stated, the ALJ found Plaintiff's fibromyalgia to be a non-severe impairment.  In determining Plaintiff's RFC, the ALJ stated that he "considered all symptoms" in making his RFC determination.[93]  "[O]ur general practice . . . is to take a lower tribunal at its word when it declares that it has considered a matter."[94]

Further, when discussing Plaintiff's credibility, the ALJ noted that Plaintiff "reported an extremely limited lifestyle due to [her] physical impairments," but noted that such statements were in contrast to her activities of daily living.[95]  Thus, the ALJ found that her "abilities clearly indicate that the claimant retains adequate ability to perform at least sedentary to light work."[96]  From this, it is clear that the ALJ considered Plaintiff's fibromyalgia in determining her RFC.

This conclusion is further supported by the physical restrictions placed on Plaintiff by the ALJ.  The ALJ limited Plaintiff's standing or walking to no more than 6 hours, sitting to no more

---

[91]20 C.F.R. § 404.1545(a)(2).

[92]*Salazar v. Barnhart*, 468 F.3d 615, 621 (10th Cir. 2006).

[93]R. at 21.

[94]*Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005).

[95]R. at 23.

[96]*Id.*

than 6 hours, and required that Plaintiff be able to make brief postural changes every 30 minutes "to be as comfortable as possible."[97]  The ALJ also made other limitations directly linked to Plaintiff's physical abilities.  As Plaintiff's only other physical impairments related to her seizure disorder, it is clear from the record that these limitations were put in place as a result of Plaintiff's fibromyalgia.  Therefore, the Court cannot find that the ALJ erred in his RFC analysis.

Plaintiff next argues that the ALJ failed to properly consider the opinions of both Dr. Rodgers and Mr. McCarty in his RFC assessment.  As discussed above, the Court finds that the ALJ properly considered the opinions of Dr. Rodgers.  That same analysis is largely applicable to Mr. McCarty.  Therefore, the Court must reject this argument.

Finally, Plaintiff argues that the ALJ failed to comply with the requirements of Social Security Ruling 96-8p.  Social Security Rule 96-8p states that "[t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."[98]  Plaintiff argues that the ALJ's RFC analysis does not meet this standard.

Having thoroughly reviewed the ALJ's decision, the Court disagrees with Plaintiff's argument.  The ALJ clearly sets out his RFC assessment and then discusses the evidence that supports that assessment, specifically discussing the documentary evidence, the opinion evidence, and conducting a credibility assessment.  The Court finds no error in how the ALJ approached this portion of the decision.

---

[97]*Id*. at 21.

[98]Social Security Ruling 96-8p, 1996 WL 374187 (July 2, 1996).

D.     WHETHER THE ALJ ERRED IN FAILING TO UNDERTAKE A SEPARATE DRUG
       AND ALCOHOL ANALYSIS

Plaintiff's final argument is that the ALJ failed to complete the drug and alcohol dual-

analysis required by 20 C.F.R. § 404.1535.  The Commissioner contends that the ALJ was not

required to undertake that analysis because he found her "not disabled" and that the ALJ does not

have to "argue in the alternate."[99]

The Act requires that if drug addiction or alcoholism is a contributing factor material to

the determination of disability, "an individual shall not be considered to be disabled."[100] A

finding of disability is a condition precedent to the determination whether alcoholism or drug

addiction is a contributing factor material to the disability determination.[101]  Therefore, in a case

where drug addiction or alcoholism is suggested by the evidence, the ALJ must first apply the

five-step sequential evaluation process to determine whether a claimant's condition, including

consideration of drug addiction or alcoholism, is disabling.  If so, the ALJ must then assess the

claimant's RFC limitations which would remain if she stopped using drugs or alcohol, and apply

steps four and five a second time to determine whether the limitations assessed would be

disabling.[102]  If the alcoholism or drug addiction is a contributing factor material to the

determination of disability, the claimant will be found not to be "disabled" as defined in the

---

[99]Docket No. 18, at 20.

[100]20 C.F.R. § 404.1535.

[101]*Drapeau*, 255 F.3d at 1214.

[102]*Id*. at 1214–15.

Act.[103]  The key factor in determining whether drug addiction or alcoholism is a contributing

factor material to the determination of disability "is whether the Commissioner would still find

the claimant disabled if he or she stopped using drugs or alcohol."[104]

Plaintiff relies on *Salazar v. Barnhard*, to support her contention that the ALJ erred.  In

*Salazar*, the Tenth Circuit discussed the analytical process an ALJ must go through prior to

concluding that drug and alcohol addiction is material to the conclusion a claimant is disabled.[105]

The opinion focused upon a teletype issued by the Commissioner pertaining to "situations where

a claimant has one or more other mental impairments in addition to [drug and alcohol

addiction]."[106]  Further, the Court noted that the teletype "stresses the need for careful

examination of periods of abstinence and also directs that if the effects of a claimant's mental

impairments cannot be separated from the effects of substance abuse, the [drug and alcohol

addiction] is not a contributing factor material to the disability determination."[107]

*Salazar* is distinguishable because, unlike the claimant in that case, Plaintiff was not

found to be disabled at any step of the sequential process.  As plaintiff was not found to be

---

[103]*Id*. at 1215.

[104]*Id*.; *see also* 20 C.F.R. § 416.935(b)(1) (key factor is "whether we would still find you
disabled if you stopped using drugs").

[105]468 F.3d at 623.

[106]*Id*.

[107]*Id*.

disabled, the ALJ was not required to make any additional findings on this issue.[108]  Therefore, there was no error in the ALJ not conducting a drug and alcohol analysis.

### IV.  CONCLUSION

Having made a thorough review of the entire record, the Court finds that the ALJ's evaluation and ruling is supported by substantial evidence.  Therefore, the Commissioner's findings must be affirmed.  Further, the Court finds that the ALJ applied the correct legal standard in determining that Plaintiff did not have a disability within the parameters of 20 C.F.R. § 404.1520 (a)-(f).

For the reasons just stated, the Court hereby AFFIRMS the decision below.  The Clerk of the Court is directed to close this case forthwith.

DATED   August 17, 2012.

BY THE COURT:

_____
TED STEWART
United States District Judge

---

[108]*Tower v. Barnhart*, 89 F. App'x 186, 189 (10th Cir. 2004).